In re Nancy Elaine YBARRA, Debtor.

Nancy Elaine Ybarra, Appellant,

v.

Boeing North American, Inc., Successor for Limited Purposes to Rockwell International Corp.; United States Trustee; Alfred H. Siegel, Trustee, Appellees.

BAP No. CC–02–1356–KBaP.

Bankruptcy No. ND 91–11779–RR.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Nov. 20, 2002.

Filed June 26, 2003.

Nancy Elaine Ybarra, Santa Barbara, CA, Pro se.

Wayne R. Terry, Mitchell, Silberberg & Knupp, Los Angeles, CA, for Boeing North American, Inc.

Before KLEIN, BAUM[1] and PERRIS, Bankruptcy Judges.

## OPINION

PERRIS, Bankruptcy Judge.

The issue in this case is whether the bankruptcy discharge applies to attorney fees and costs awarded against a debtor for unsuccessful postpetition state court litigation of prepetition causes of action, where the action was commenced prepetition. Based on our understanding of the Ninth Circuit decisions addressing this issue, we conclude that the fees and costs are discharged and REVERSE.

## FACTS

In 1988, debtor Nancy Ybarra sued her former employer, Rockwell International Corp. ("Rockwell"), the successor of which is appellee Boeing North American, Inc., on state law theories for which attorney fees may be awarded to prevailing parties.

Ybarra filed a chapter 11[2] bankruptcy in 1991, which was converted to chapter 7 in 1993. She did not schedule the cause of action against Rockwell as an asset until 1993.

The Ybarra–Rockwell litigation has spawned six different appeals, including four previous federal appeals that were each dealt with by the BAP and by the Ninth Circuit.[3]

In 1993, Rockwell filed a proof of claim in the chapter 7 case for its legal fees, both prepetition and postpetition. The court sustained Ybarra's claim objection without prejudice to reconsideration after the litigation ended.

In November 1993, the court approved, over Ybarra's protest that the cause of action was exempt property, a "compromise" whereby the chapter 7 trustee would sell the cause of action, which Rockwell purchased for $17,500 at the ensuing auction.

Once the challenge by the case trustee and Rockwell to Ybarra's claim of exemption in the cause of action was sustained, the trustee and Rockwell dismissed the lawsuit.

We later reversed the order denying Ybarra's claim of exemption, which decision was affirmed by the Ninth Circuit.[4]

---

1. Hon. Redfield T. Baum, Sr., Bankruptcy Judge for the District of Arizona, sitting by designation.

2. Chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, unless otherwise indicated.

3. The prior federal appeals were: BAP No. CC–93–2331, aff'd, 40 F.3d 1247, 1994 WL 654924 (9th Cir.1994); BAP No. CC–94–1264, aff'd, 124 F.3d 215, 1997 WL 579130 (9th Cir.1997); BAP No. CC–99–1616, aff'd, 243 F.3d 552, 2000 WL 1728359 (9th Cir.2000); BAP No. CC–00–1179, aff'd, 21 Fed.Appx. 672 (9th Cir.2001). The state appeal was: No. E029752, Cal. Ct.App. (4th Dist, Div.2).

4. No. CC–94–1264, aff'd, 124 F.3d 215, 1997 WL 579130 (9th Cir.1997).

On remand, the bankruptcy court ruled that the cause of action was exempt despite the fact that it was initially omitted from the schedules and was not scheduled until the case was converted to chapter 7 in 1993. The court gave debtor a choice: either accept the $17,500 that Rockwell had paid the estate for the cause of action, or accept ownership of the dismissed lawsuit and try to revive and prosecute it. Debtor chose the latter.

Although Ybarra then persuaded the state court to set aside the dismissal that had resulted from the settlement between the trustee and Rockwell, Rockwell ultimately prevailed on the merits and obtained a judgment in 1999 that awarded Rockwell $456,884.08 in statutorily authorized attorney fees and costs. That judgment was affirmed on appeal in 2001 and is final.

Rockwell, not wishing to risk violating the bankruptcy discharge injunction, filed in bankruptcy court a "Motion For Leave To Collect Costs And Fees Award" in which it asserted that the $456,884.08 award was unaffected by debtor's discharge.

The bankruptcy court, following *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir.1998), ruled that fees attributable to the period after the bankruptcy case was filed in 1991 were postpetition debts not covered by the discharge. For ease of calculation, Rockwell thereupon limited its request to the $159,030.78 in fees and costs incurred after the state court action was revived.

The court entered an order declaring that $159,030.78 is not encompassed by the bankruptcy discharge. Ybarra timely appealed.

### ISSUES

1. Whether the bankruptcy discharge applies to an attorney fee and cost award for debtor's unsuccessful postpetition litigation of prepetition causes of action, on which litigation had commenced prepetition.

2. Whether appellee's postpetition recording of the state court judgment violated § 524.

### STANDARD OF REVIEW

■ Interpretation of the Bankruptcy Code is a legal question that we review de novo. *Yadidi v. Herzlich (In re Yadidi)*, 274 B.R. 843, 847 (9th Cir. BAP 2002).

### DISCUSSION

1. *Discharge*

A chapter 7 bankruptcy discharge "discharges the debtor from all debts that arose before the date of the order for relief under this chapter ...." § 727(b). When a debtor's actions that result in the award of attorney fees and costs on a prepetition claim are undertaken postpetition, the question arises whether those fees and costs are prepetition debts encompassed in the discharge.

The Ninth Circuit has addressed this issue either directly or indirectly in three cases. Two of the pertinent cases reject administrative expense priority for attorney fees incurred by a creditor in postpetition litigation on the basis that the fee claim arose from a prepetition claim. The third case deals with whether attorney fees arising from the postpetition litigation of a prepetition claim are dischargeable. Although differing in context, the outcome in all three cases turned on one question: were the attorney fees a prepetition claim?

First, in *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755 (9th Cir.1998), the court considered whether attorney fees awarded against a debtor for unsuccessfully defending the appeal of a

state court judgment in his favor should be given administrative expense priority under § 503(b)(1). When the debtor filed a chapter 11 bankruptcy case, he was defending an appeal of a state court award in his favor on a real estate contract claim. The state supreme court reversed the debtor's judgment and awarded attorney fees to the defendant pursuant to the contract's attorney fee provision. The defendant sought administrative expense priority for the fee award.

The Ninth Circuit rejected administrative expense treatment of the claim. It noted that "costs and expenses arising out of prepetition contracts are treated under the Bankruptcy Code as nonprioritized unsecured claims." *Abercrombie*, 139 F.3d at 757. Thus, the question was whether the fees incurred by the defendant postpetition in successfully pursuing its appeal arose out of the prepetition contract. Because the prepetition contract was the source of the fee award, the court of appeals concluded that the fees were prepetition claims not entitled to administrative expense treatment. It rejected the defendant's argument that the fees should be given priority because the defendant "was 'injured' by the debtor-in-possession's postpetition decision to continue defending the trial court judgment rather than conceding its invalidity in the Oregon Supreme Court." *Id.* at 758. The court focused on the source of the estate's obligation, which was the prepetition contractual fee provision. *Id.* at 759.

The reasoning of *Abercrombie* is that a claim for attorney fees is a prepetition claim if the source of the fee award is a prepetition contract, regardless of whether the fee award is the result of the debtor's postpetition activity.

Six weeks after deciding *Abercrombie*, the Ninth Circuit decided *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525

(9th Cir.1998). In that case, the debtor sued a lender in state court after the bankruptcy was filed, asserting a lender liability theory that was based on prepetition conduct. The debtor had not, however, scheduled the cause of action as an asset in his bankruptcy schedules. The lender removed the action to federal district court, obtained summary judgment on the state law claims, and was awarded contractual attorney fees.

On appeal, the debtor challenged the fee award on the ground that the claim for attorney fees had been discharged. The Ninth Circuit noted that whether the claim for fees was discharged depended on when the attorney fee debt arose, because a discharge applies only to debts that arose prepetition.

Without mentioning the *Abercrombie* line of analysis, the *Siegel* panel noted that claims in bankruptcy must be "provable" and then reviewed the statutory definition of "claim," which is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Siegel*, 143 F.3d at 532 (quoting § 101(5)(A); emphasis added by Ninth Circuit). It noted that a contingent claim is one for which the debtor will become obligated to pay "only upon the occurrence or happening of an extrinsic event[.]" *Id.* (quoting *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir.1987)). However, the panel reasoned, a claim is not contingent when the debtor has control over whether the contingency occurs; the liability must be "contingent upon what others might do." *Siegel*, 143 F.3d at 533.

The *Siegel* panel also expressed a sense of "doing justice":

This is a case where the debtor, Siegel, had been freed from the untoward effects of contracts he had entered into.

[The lender] could not pursue him further, nor could anyone else. He, however, chose to return to the fray and use the contract as a weapon. It is perfectly just, and within the purposes of bankruptcy, to allow the same weapon to be used against him.

*Id.*

The court quoted an observation from other cases that bankruptcy is not intended to insulate the debtor from the costs of post-bankruptcy acts and said that the discharge protected Siegel "from the results of his past acts, including attorney's fees associated with those acts, [but] did not give him carte blanche to go out and commence new litigation about the contract without consequences." *Id.* at 534; *Shure v. Vermont (In re Sure–Snap Corp.)*, 983 F.2d 1015, 1018 (11th Cir.1993); *In re Hadden*, 57 B.R. 187, 190 (Bankr.W.D.Wis. 1986).

The reasoning of *Siegel* is that, where liability on a prepetition claim is entirely contingent on actions initiated by the debtor postpetition, rather than actions taken by another party, the liability is not a "claim" as defined in the Bankruptcy Code and is not subject to discharge.

Finally, in 2000, the Ninth Circuit decided *Kadjevich v. Kadjevich (In re Kadjevich)*, 220 F.3d 1016 (9th Cir.2000). In that case, the debtor was the defendant in a prepetition state court fraud action. After he filed chapter 11 bankruptcy and before the case was converted to chapter 7, the bankruptcy court granted relief from the automatic stay so the state court action could continue. The debtor settled the fraud action during the pendency of the bankruptcy case. However, he then breached that settlement agreement, and the fraud case went to trial. The debtor lost, and the court awarded attorney fees against him under the state's general sanctions statute. The question was whether the fee award was an administrative expense that should be given priority of payment in the debtor's bankruptcy case.

The *Kadjevich* court held that the claim for fees incurred postpetition was not an administrative expense because it was a prepetition claim. Relying on *Abercrombie,* the court reasoned that "the 'source' of the award of attorney fees is the prepetition state-court fraud action that brought [the debtor] under the jurisdiction of the California courts and subjected him to the fee-shifting rule contained in California Code of Civil Procedure § 128.5." *Kadjevich,* 220 F.3d at 1020. The state court judgment was "unitary; all of it must be considered prepetition under the reasoning of *Abercrombie.*" *Id.*

The court saw no difference between a prepetition contract action and a prepetition fraud action; nor did it matter that the debtor's conduct that resulted in the award of fees (breach of a settlement agreement) did not occur until after the bankruptcy petition was filed: "[T]he fact that [the debtor] did not engage in the particular misconduct that caused the fees to be awarded until after he filed his bankruptcy petition does not change the fundamentally pre-petition nature of the fraud action and of the total resulting judgment." *Id.* The court concluded that, "[b]ecause [the plaintiff's] claim for attorney fees arises from the same pre-petition obligation as the damages, back rent, costs, and all other components of the state court's judgment, it should be afforded the same priority in federal bankruptcy proceedings as those other items." *Id.*

The *Kadjevich* holding was intended to be narrow:

We do not deal here with a case in which a representative of the estate commenced litigation on behalf of the estate after a bankruptcy petition was filed, or

one in which the representative obtained relief from the automatic stay to continue pre-petition litigation[.]

*Id.* at 1021 (citations omitted). There was no mention of *Siegel.*

Our task is to try to reconcile these cases.[5] Ybarra argues that the attorney fee award in the state court action in this case is like the award in *Abercrombie* and *Kadjevich,* because the award is based on a prepetition claim that debtor continued to pursue postpetition. Appellee argues, and the bankruptcy court agreed, that the result in this case is governed by *Siegel,* because Ybarra revived the dismissed lawsuit postpetition, which action, it is argued, equates with Siegel's filing of a postpetition lawsuit on a prepetition claim.

Reading these cases together, it is apparent that the rule set out in *Abercrombie,* that the key to determining whether a claim is a prepetition claim is to look to the source of the claim, is not universal. In *Siegel,* the lender liability cause of action arose prepetition, yet the court concluded that the fees awarded for the litigation commenced postpetition were not a prepetition debt.

Our search for possible distinctions by which to reconcile *Abercrombie* and *Siegel* led us to a number of dead ends.

We explored the possibility of distinguishing the cases based on the identity of the contingent actor. In *Abercrombie,* the attorney's fee claim was contingent on what the state supreme court would decide postpetition, rather than any action by the debtor, while the *Siegel* contingency was purely under Siegel's control. Until Siegel filed his postpetition lawsuit, he controlled whether he would subject himself to the possibility of liability for fees by commencing the action.

*Kadjevich,* however, belies this distinction. There, the debtor controlled the decision whether he would risk an award of attorney fees; he had settled the fraud claim. The fees were awarded only when the action proceeded due to his breach of the settlement agreement. The court nonetheless concluded that the attorney fees were prepetition claims because they were based on the prepetition fraud. Thus, a distinction based on the identity of the contingent actor is not viable.

Nor can the difference between the cases be explained by whether the source of the fee award is contractual or statutory. In *Abercrombie* the award was based on contract, while in *Kadjevich* it was based on statute, yet the cases reached the same result. In *Siegel* the fee award was based on contract, yet the result was different from *Abercrombie.*

Nor can the cases be distinguished based solely on the timing of the debtor's conduct that gave rise to the fees. In both *Siegel* and *Kadjevich,* the debtor's conduct that gave rise to the awards of attorney fees occurred postpetition, yet the cases came to opposite results.

It could also be argued that the cases can be distinguished on the basis of whether the claim is pursued by a trustee or debtor in possession for the benefit of the estate, or by a debtor to whom the claim has been abandoned. In both *Abercrombie* and *Kadjevich,* the postpetition action

---

**5.** The dissent discusses a fourth case, *O'Loghlin v. County of Orange,* 229 F.3d 871 (9th Cir.2000). We do not view *O'Loghlin* as helpful to the analysis. That case involved statutory violations that occurred postpetition and postconfirmation. They were either separately actionable or were part of a continuing violation for which the claim was not discharged. In this case, Ybarra simply continued to pursue her prepetition claim, ultimately resulting in an award of attorney fees when she was unsuccessful. Ybarra did not engage in any postpetition statutory violations.

was undertaken by debtors in possession. Assuming that *Siegel* was a chapter 7 case (the decision is not clear on this point) and that the debtor was pursuing the claim for his own benefit, the court did not rely on that distinction in reaching its decision.

The distinction that does appear to withstand scrutiny is that, in *Abercrombie* and *Kadjevich,* the actions on the prepetition claims had been commenced prepetition and continued to be litigated postpetition, with the debtor defending the appeal in *Abercrombie* and the debtor defending the state court action in *Kadjevich.* In *Siegel,* in contrast, the action that gave rise to the attorney fee award was commenced postpetition. That the court of appeals appears to consider this a valid distinction is supported by the language in *Kadjevich* in which it says that it was not dealing "with a case in which a representative of the estate commenced litigation on behalf of the estate after a bankruptcy petition was filed . . . ." *Kadjevich,* 220 F.3d at 1021. If the only question were whether the fees were based on a prepetition source, it would be immaterial whether an estate representative commenced litigation postpetition on a prepetition claim or merely kept prosecuting an action commenced prepetition.

We confess to puzzlement about why the timing of the commencement of an action on a prepetition claim should matter. The question of whether a debt is within the bankruptcy discharge should be whether the claim is one that arose prepetition or postpetition, not when the action on the prepetition claim was commenced. That same analysis should apply to whether a claim arose prepetition or postpetition for purposes of determining whether the claim has administrative priority. However, our task is to apply the cases as they are given

to us, doing our best to understand the distinctions the court made.

■ In this case, Ybarra commenced her action against Rockwell before she filed bankruptcy, not after. If the bankruptcy trustee had not caused the state court action to be dismissed on the basis that it was not Ybarra's exempt property, which ruling was later reversed on appeal, Ybarra would never have needed to revive it. In light of the fact that Ybarra had no control over the trustee's dismissal, and in light of the fact that she later won the relevant appeal, her revival of the action constitutes a restoration of the status quo and cannot legitimately be seen as the commencement of a new action. Thus, this case is like *Abercrombie* and *Kadjevich* and not like *Siegel,* and the fees were discharged in debtor's bankruptcy.[6]

## 2. *Discharge injunction*

Ybarra argues that entry of the judgment in state court violated the § 524 discharge injunction, which provides that a discharge "voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged" and "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]" § 524(a)(1)-(2). *See Ruvacalba v. Munoz (In re Munoz),* 287 B.R. 546, 550–53 (9th Cir. BAP 2002).

■ The discharge injunction, however, is "inapplicable to [a creditor's] postpetition defensive action in a prepetition suit brought by the debtor." *Gordon v. Whit-*

---

**6.** Because we conclude that the fees were discharged, we need not consider Ybarra's

argument that appellee's motion for leave to collect the fees is barred by claim preclusion.

*more (In re Merrick),* 175 B.R. 333, 336 (9th Cir. BAP 1994). Thus, the filing of a motion for costs does not violate the discharge injunction.

■ Here, appellee's fees were included in its memorandum of costs, and we see no material difference between a motion for costs and one that includes both costs and attorney fees. It follows that appellee did not offend the § 524(a)(2) discharge injunction by filing its memorandum of costs. Likewise, the mere entry of the judgment did not offend the discharge injunction.

■ The award itself, however, constitutes a judgment that purports to establish the personal liability of the debtor with respect to a debt that was discharged under § 727. Hence, the judgment is void under § 524(a)(1), and it would be a violation of the § 524(a)(2) discharge injunction to attempt to collect it.

## CONCLUSION

The bankruptcy court erred in determining that the attorney fees and costs awarded by the state court were not discharged. Therefore, we REVERSE.

KLEIN, Bankruptcy Judge, Concurring.

I join Judge Perris' opinion, thereby making it the majority decision. While I agree that the Ninth Circuit decisions, which are unquestionably in disarray, permit a distinction based on whether the underlying lawsuit on the prepetition cause of action was filed before or after bankruptcy, I worry that this distinction lacks a principled difference.

I write separately to explain that there is an alternative, more-satisfying analysis for harmonizing *Abercrombie, Kadjevich,* and *Siegel.* The disadvantage of that analysis is that it requires *Siegel* to be construed as meaning something other than what it appears to say. I will, nevertheless, set it forth for the benefit of future litigants and for potential consideration the next time the court of appeals encounters the issue.

The bottom line is that *Siegel* is a classic example of a correct result reached for the wrong reason. The decision originated with a district judge who correctly recognized something rotten about what Mr. Siegel was doing but who did not have the benefit of the view of a bankruptcy judge who would have had the opportunity to point out that there was a simple and direct bankruptcy law solution to the problem.

The simple answer is that *Siegel* was a proper response to misconduct and should be limited to misconduct situations that warrant departure from the general rule stated in *Abercrombie.* Specifically, Mr. Siegel did not have standing to prosecute the unscheduled lender liability action because it was property of the bankruptcy estate (even after the case closed). The fee award against him could be affirmed on theories of judicial estoppel and inherent-authority sanctions for intermeddling with a cause of action that he did not own.

### I

At the outset, it is worth noting that the underlying issue of how to treat postpetition litigation expenses on prepetition causes of action is one of those situations in which it is more important that there be one rule consistently applied than whether the merits of the particular rule are beyond cavil. All sides of the question have merit. In the absence of a definitive ruling or statutory clarification, argument could continue in perpetuity without getting closer to resolution.

Once the legal world knows whether postpetition litigation expenses will be

treated as prepetition or postpetition debts, litigants can take the known rule into account as they go about making litigation decisions.

## II

As the majority opinion notes, the Ninth Circuit is inconsistent regarding pre- or postpetition status for postpetition expenses of pursuing prepetition affirmative claims.

The bankruptcy appellate panel originally came down on what is now Rockwell's side and concluded that postpetition litigation fee awards against a trustee on prepetition causes of action should be deemed to be postpetition. *Irmas Family Trust v. Madden (In re Madden)*, 185 B.R. 815, 819 (9th Cir. BAP 1995).

Our *Madden* decision, however, was expressly disapproved by the Ninth Circuit in *Abercrombie*, which adopted the opposite position on the identical issue holding that the key inquiry is whether the expense was rooted in the prepetition past. *Abercrombie*, 139 F.3d at 757–59.

The problem arose six weeks after *Abercrombie* when, in *Siegel*, another panel of the Ninth Circuit ignored *Abercrombie* and cited the by-then renounced *Madden* decision to support its holding that a fee award against a debtor under a prepetition contract for postpetition litigation activity on a prepetition cause of action sounding in contract and tort is a postpetition obligation not encompassed by the bankruptcy discharge.

The *Siegel* panel ruled that the prepetition past was not controlling and that postpetition litigation conduct was not the maturation of a prepetition contingent attorney's fee claim under the prepetition contract. *Siegel*, 143 F.3d at 531–34.

## III

The obvious difference between the apparently inconsistent decisions is the identity of the person who prosecuted the prepetition cause of action postpetition. In *Abercrombie*, it was the trustee; in *Kadjevich*, it was a creditor complaining about what the debtor did postpetition; and in *Siegel*, it was the debtor (*Madden* involved a chapter 11 debtor performing the duties of the trustee). I do not think, however, that the identity of plaintiff is a distinction that should make a difference.

### A

The bankruptcy estate that comes into being when the case is filed includes all of the debtor's interests in property, including intangible causes of action. The bankruptcy trustee is entitled to prosecute any such cause of action. FED. R. BANKR. P. 6009.[7] The trustee can also abandon the cause of action to the debtor as being of inconsequential value and benefit to the estate. 11 U.S.C. § 554(a). Nor is it uncommon for a trustee, especially where part of a recovery would be exempt, to agree to a joint litigation or judgment-sharing arrangement whereby the debtor prosecutes the action and shares proceeds with the estate for the benefit of creditors. Thus, the trustee is permitted to employ a debtor's lawyer. 11 U.S.C. § 327(e).[8]

---

**7.** Rule 6009 provides:

> With or without court approval, the trustee or debtor in possession may prosecute or may enter an appearance and defend any pending action or proceeding by or against the debtor, or commence and prosecute any

action or proceeding in behalf of the estate before any tribunal.

FED. R. BANKR. P. 6009.

**8.** The section provides:

> (e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in

In short, the structure of the Bankruptcy Code contemplates that a prepetition cause of action may be prosecuted by trustee, by debtor (with permission), or by both.

If the same cause of action can be prosecuted by trustee, debtor, or both, then any rule that differentiates between them as to treatment of fee and cost awards would create incentives to manipulate and structure these arrangements in ways that could be inefficient or counterproductive for other reasons.

### B

The Bankruptcy Code does not expressly answer the problem of how the fee and cost award is to be treated.

### 1

If our view in *Madden* had not been rejected in *Abercrombie*, then fee and cost awards for postpetition litigation would be chargeable as postpetition matters both to debtor and trustee. If chargeable to the debtor, the consequence may nevertheless be that the debt is discharged.

The rule fixed by *Abercrombie*, however, for better or worse is that pre- or postpetition status of postpetition fee and cost awards turns upon whether the "source" of the underlying obligation is pre- or postpetition.

The Ninth Circuit has consistently applied this "source-of-the-obligation" analysis in a variety of contexts to determine whether an expense incurred postpetition should be treated as prepetition. *Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)*, 319 F.3d 1166, 1172–73

(9th Cir.2003); *Kadjevich*, 220 F.3d at 1020; *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1095–96 (9th Cir.1995).

Thus, the source-of-obligation analysis, which is inherently inconsistent with *Siegel*, now seems well established.

### 2

*Siegel*, which was decided six weeks after *Abercrombie*, ignored the contrary analysis in *Abercrombie* and *DAK Industries* (it did not even mention them) and reasoned that even though the contract provision on which the attorney's fee award was ultimately based was prepetition, the award was not a prepetition claim because limits on "provable" claims make it too remote to be viewed as contingent. *Siegel*, 143 F.3d at 532–33.

The first problem with *Siegel* is its use of the obsolete premise that some claims are "provable" and others are "unprovable" as a basis for analyzing the concept of a contingent claim under Bankruptcy Code § 101(5) as limited and not extending to postpetition attorney's fees occasioned by the debtor's postpetition litigation activity on the prepetition contract. In doing so, it cited decisions under the old 1898 Bankruptcy Act.

In the 1978 enactment of what is now § 101(5), Congress renounced the concept of "provability" in favor of what it described as "the broadest possible definition" of claim that would include "all legal obligations of the debtor, no matter how remote or contingent."[9] Thus, *Siegel's* premise was obsolete.

---

conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

**9.** The House and Senate committee reports explain the new concept of "claim" at 11 U.S.C. § 101(5) [originally § 101(4)]:

Paragraph (4) defines "claim." The effect of the definition is a significant depar-

A second problem with *Siegel* is that, although it says that the postpetition attorney's fees based on the prepetition contract are not contingent claims, *Abercrombie* makes clear that they would be deemed contingent prepetition claims if the trustee, instead of the debtor, had prosecuted the action in question. That distinction should not make a difference.

Third, *Siegel* relies upon our earlier *Madden* analysis even though another Ninth Circuit panel had squarely rejected *Madden* six weeks earlier in *Abercrombie*. More recently, the *Abercrombie* source-of-obligation analysis was followed in *Kadjevich*.

In short, it is debatable whether *Siegel* is sufficiently authoritative as to justify a refusal to follow *Abercrombie*.

### IV

While the precise reasoning stated in *Siegel* presents the problems described, *Siegel* can be harmonized with the decision in the *Abercrombie* and *Kadjevich* line.

*Siegel* is eminently correct when it is understood as a judicial estoppel or inherent-authority sanctions decision.

It is plain that the Ninth Circuit's *Siegel* panel had equity in mind when it expressed the sense that something was rotten and inequitable about the way the debtor had attempted to use the prepetition contract as a weapon: "It is perfectly

just, and within the purposes of bankruptcy, to allow the same weapon to be used against him." *Siegel,* 143 F.3d at 533. I agree and can provide a more precise bankruptcy law explanation of the problem.

### A

The bankruptcy law explanation of what was rotten about Mr. Siegel prosecuting the cause of action begins with his omission to schedule his prepetition contract and tort causes of action as assets on his bankruptcy schedules. This violated 11 U.S.C. § 521(1) and probably violated 18 U.S.C. §§ 152(1)-(2).

As a matter of law, the causes of action were "property of the estate" notwithstanding that they were not scheduled. 11 U.S.C. § 541(a). Property of the estate is protected by the automatic stay so long as it remains property of the estate. 11 U.S.C. § 362(c)(1). Property of the estate that is not scheduled and that is not administered by the trustee remains property of the estate after the case is closed—i.e., forever. 11 U.S.C. § 554(d); *Alary Corp. v. Sims (In re Associated Vintage Group, Inc.),* 283 B.R. 549, 566 n. 14 (9th Cir. BAP 2002).

Mr. Siegel exercised dominion over causes of action that were property of the estate by suing in state court. This violated the automatic stay because suing to

---

ture from present law. Under present law, "claim" is not defined in straight bankruptcy. Instead it is simply used, along with the concept of *provability* in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of present law far more broadly. The definition in paragraph (4) adopts an even broader definition of claim [than] is found in the present debtor rehabilitation chapters.... By this broadest possible definition, and by the use of the

term throughout title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.
H.Rep. No. 95–595, p. 309 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6266; S. Rep. No 95–989, pp. 21–22 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5087–88 (emphasis supplied).

obtain judgment on the estate's causes of action is an act to obtain possession of property of the estate.[10] 11 U.S.C. § 362(a)(3).

When the action was removed to federal district court and dismissed with the fee award that was subsequently affirmed in the *Siegel* decision, the dismissal was predicated on a res judicata theory that is problematic.[11] The rationale was that Mr. Siegel had not objected to the claim that the defendant had filed in the bankruptcy case.

The real problem facing the district court was that Mr. Siegel had no authority to prosecute the action in the first place. He was not the real party in interest, lacked standing to act without permission

from the bankruptcy court and trustee, and had committed some stark (potentially criminal) violations of bankruptcy law, all of which adds up to serious misconduct.

In order to deal correctly with the situation on the merits, the bankruptcy trustee would have had to have been made a party. If the bankruptcy case had been closed, it would have had to be reopened with an order directing the appointment of a trustee who could then deal with the property of the estate. *Associated Vintage Group*, 283 B.R. at 549 n. 14; *In re Mahan*, 104 B.R. 300, 300–01 (Bankr. E.D.Cal.1989). To the extent the causes of action may have merit, the trustee would be free to prosecute them on behalf of the estate for the benefit of creditors.

**10.** Likewise, one could argue that the district court's dismissal of the action was void as a violation of the automatic stay. *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 574 (9th Cir.1992); *Associated Vintage Group*, 283 B.R. at 566 n. 14.

**11.** The res judicata analysis was that a proof of claim will be afforded claim preclusive effect so as to preclude all potential counterclaims if nobody objects to the proof of claim. The puzzle is that the statutory claims structure contemplates a summary procedure that may be resolved without evidentiary hearings but as to which the bankruptcy court has discretion in any particular situation to require be resolved by way of actual trial. A trustee is not required to examine and object to claims unless "a purpose would be served." 11 U.S.C. §§ 704(5), 1106(a)(1), 1202(b)(1), & 1302(b)(1). Whether the debtor has standing to object to claims depends upon whether the debtor would be "adversely and pecuniarily affected" if the claim were to be allowed. In the typical "no-asset" chapter 7 case there is no distribution that will be made to creditors and no reason to examine or challenge claims. As it appears that *Siegel* was a no-asset situation, the rationale for applying claim preclusion is debatable because the trustee had no obligation to examine and object to the claim of Federal Home Loan Bank Board and the debtor's standing to object was doubtful.

The *Siegel* panel did not explore whether any of the standard exceptions to claim preclusion apply, two of which, as set out in the *Restatement (Second) of Judgments* are particularly pertinent:

§ 26 Exceptions to the General Rule Concerning Splitting

(1) When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant;

(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief; or

(d) The judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme, or it is the sense of the scheme that the plaintiff should be permitted to split his claim;

Restatement (Second) of Judgments § 26(1)(c)-(d).

The district court had a number of tools in the toolbox for dealing with Mr. Siegel, and, if it used the wrong tool, the court of appeals was nevertheless entitled to affirm for a reason supported by the record. 28 U.S.C. § 2111; FED. R. CIV. P. 61; *Dittman v. California,* 191 F.3d 1020, 1027 n. 3 (9th Cir.1999).

## B

One tool for dealing with the type of a transcendent and pervasive violation of the litigation process involved in Mr. Siegel's misconduct, which qualifies as "bad faith" by any measure, is the court's inherent sanctioning authority under *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

The attorney's fees incurred in defending against the debtor's bad-faith attempt to control property of the estate constitute the precise remedy authorized by *Chambers. Id.*

Nor would an attorney's fee award for bad-faith litigation conduct be deemed a prepetition debt under *Abercrombie,* which decision recognized a limited exception to its rule of prepetition treatment of postpetition expenses on prepetition causes of action. This is the so-called *Reading* exception originally fashioned by the Supreme Court, whereby postpetition or administrative priority treatment, for example, is afforded on account of a postpetition tort or where a business is operated postpetition in violation of nonbankruptcy law and an injunction. *Abercrombie,* 139 F.3d at 758, *citing Reading v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), *and Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.),* 755 F.2d 200 (1st Cir.1985).

In *Abercrombie,* the Ninth Circuit declined to apply the *Reading* exception to the postpetition choice of the debtor-in-

possession to continue litigation that had started prepetition. 139 F.3d at 758–59, *adopting Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.),* 954 F.2d 1, 7 (1st Cir.1992). In other words, the *Abercrombie* panel was holding that the trustee, a debtor performing the duties of the trustee, or a debtor acting with permission of bankruptcy court and trustee are insulated from the *Reading* exception because these situations do not involve failures to comply with the Bankruptcy Code.

Mr. Siegel, in contrast, was acting in stark violation of bankruptcy law without any conceivably legitimate justification for his conduct. Sanctions for such bad-faith postpetition litigation misconduct should receive the same treatment as postpetition tort and postpetition violations of law.

Hence, the district court's award in *Siegel* plainly qualified for the *Reading* exception and could, consistent with *Abercrombie,* have been affirmed on that basis.

## C

Another device that the Ninth Circuit could have pressed into service as a way to affirm in *Siegel* is the equitable doctrine of judicial estoppel.

One form of the doctrine of judicial estoppel is the so-called "preclusion of inconsistent positions." *New Hampshire v. Maine,* 532 U.S. 742, 749–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 782–85 (9th Cir.2001); *Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600–01 (9th Cir.1996); *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990); 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4477 (2002).

In this circuit, the first inconsistent position must have been "accepted" by the court, which may be satisfied by implied

"acceptance" of a debtor's schedules reflected by the issuance of a bankruptcy discharge, even if that discharge is later revoked. *Hamilton,* 270 F.3d at 783–84.

*Siegel* presented two inconsistent prior positions. First, failure to have scheduled the causes of action was a representation that they did not exist, which position was "accepted" by the bankruptcy court when the discharge was entered. Second, when he sued on the causes of action, Mr. Siegel took the position that the contract remained in effect, which position was "accepted" when the district court proceeded to deal with the merits by way of resolving the affirmative defense of claim preclusion. When he later contended that he had no liability under the contractual attorney's fee provision, he could have been judicially estopped from denying that liability.

Thus, *Siegel* can be understood a judicial estoppel case.

## V

It follows from the foregoing harmonization of *Siegel* that *Abercrombie* continues to state the law of the circuit on prepetition/postpetition status of postpetition litigation expenses incurred in prosecuting prepetition causes of action. *Siegel* should be viewed as representing a version of the limited *Reading* exception to the general rule established in *Abercrombie.*

The fact that Ybarra initially omitted to schedule the cause of action against Rockwell and did not schedule it until the case converted to chapter 7 does not rise to the level of misconduct that would warrant application of the *Reading* exception.

The bankruptcy court held in 1998 that the facts surrounding Ybarra's initial failure to schedule the asset did not warrant rejection of her claim of exemption in the cause of action. The decision overruling the objection to claim of exemption is final

and preclusive of the misconduct issue actually litigated therein. If Ybarra's missteps were not sufficiently egregious to warrant stripping her of her claim of exemption, they similarly do not rise to the level to qualify for the *Reading* exception.

Under this view, the bankruptcy court based its decision on the erroneous premise that *Siegel* reflects a general rule. While I have no quarrel with the logic of the bankruptcy court's analysis (which reached the same conclusion as our prior panel reached in *Madden* ) of the merits of this intractable issue, the fact is that the Ninth Circuit fixed a contrary rule in *Abercrombie* as law of the circuit.

As noted, it is more important in this instance that there be a discernable rule on which litigants can predicate their strategies, than that the rule be compellingly correct. I submit that the optimal harmonization would be to hold that *Abercrombie* controls as stating the general rule and that *Siegel* merely states a misconduct-oriented version of the limited *Reading* exception that does not apply to the facts of this case.

BAUM, Bankruptcy Judge, dissenting.

While I appreciate and respect the majority's and concurrence's analysis of this seemingly unclear area of the law, I must respectfully dissent. As my colleagues have aptly explained, it is not an easy task to decide where this case fits within the various Ninth Circuit decisions dealing with attorney's fees awarded postpetition against bankrupt debtors as constituting either pre- or postpetition claims.

The majority concludes that this issue is resolved by the timing of whether the underlying action was commenced pre- or postpetition which then determines whether the discharge applies to the attorney fees. Although it is far from certain, I am not convinced that the Ninth Circuit has

established such a standard. Both *In re Abercrombie*, 139 F.3d 755 (9th Cir.1998), and *In re Kadjevich*, 220 F.3d 1016 (9th Cir.2000), dealt with the question of whether claims for postpetition attorney's fees awards should be granted first priority administrative expense status in bankruptcy cases. The purpose of administrative expense priority is to facilitate the operation of the debtor in possession's business with a view to rehabilitation. *Kadjevich* strongly suggests that the outcome there would probably have been different when it noted that its decision was a "narrow one" because the court was not dealing with a case where an estate representative had obtained stay relief to continue pre-petition litigation. *Id.* at 1021. That appears to suggest that the timing of the action was not the sole determining factor. Significantly, these cases did not consider whether such claims were discharged. The purpose of a discharge is to provide the debtor with a fresh start, which is a different concern from determining administrative priority. The Ninth Circuit has not concluded that the standard for determining administrative expense status under § 503(b) and dischargeability under § 727(b) is the same.

*Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir.1998), concluded that the debtor's actions and conduct post-discharge in pursuing litigation regarding contract obligations that had been discharged caused that debtor to be liable for attorney's fees notwithstanding the bankruptcy discharge. It was the debtor's affirmative actions in litigating claims that were otherwise subject to the bankruptcy discharge which caused the debtor to be liable for those post-discharge attorney's fees. Such rationale, that the bankruptcy discharge does not discharge actions taken post-discharge, was confirmed in *O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir.2000), which involved a similar factual

setting, *i.e.*, conduct straddling the bankruptcy discharge. There, an employee sued Orange County claiming violations of the Americans with Disabilities Act. The County claimed that its bankruptcy discharge protected it from such claims. The county's Conduct occurred both pre- and post petition. The pre-petition conduct was discharged precluding any claim thereon. However, the court held that the post discharge conduct was not discharged and, hence, was actionable. That court did not focus on when the action was filed, but rather when the conduct occurred. "A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws. A 'fresh start' means only that; it does not mean a continuing license to violate the law." *O'Loghlin*, 229 F.3d at 875.

In this case, the debtor engaged in sufficient post-discharge conduct to trigger the *Siegel* and *O'Loghlin* standard that the post discharge attorney's fees she caused Rockwell to incur were not shielded by her bankruptcy discharge.

Prior to bankruptcy, in 1988, the debtor sued Rockwell in state court. The debtor filed for relief under Chapter 11 in 1991. The case was converted to Chapter 7 in 1993 and the debtor ultimately received a discharge. After many legal proceedings in state court and bankruptcy court, the debtor re-acquired the right to pursue the action against Rockwell. In 1998, the state court ruled against the debtor and awarded Rockwell its fees and costs for defending against the debtor's claims. That decision was affirmed on appeal.

For over ten years after filing for bankruptcy protection, the debtor elected to continue to pursue her claims rather than using the bankruptcy to shield herself and allow her to walk away from the litigation and any resulting liability. Among other

postpetition actions and conduct, the debtor (1) obtained a determination that her claims were exempt; (2) pursuant to court order, elected to litigate the claims rather than take an available cash fund; (3) obtained an order from the state court reinstating the dismissed action; and, most importantly, (4) litigated the action on the merits resulting in the claim for attorney's fees now before the court.

The court's statements in *Siegel* seem to have been made with this debtor in mind:

> This is a case where the debtor, Siegel, had been freed from the untoward effect of contracts, he had entered into. Freddie Mac could not pursue him further, nor could anyone else. He, however, chose to return to the fray and to use the contract as a weapon. It is perfectly just, and within the purposes of bankruptcy, to allow the same weapon to be used against him.

*Siegel,* 143 F.3d at 533. The Court later added:

> Siegel's decision to pursue a whole new course of litigation made him subject to the strictures of the attorney's fee provision. In other words, while his bankruptcy did protect him from the results of his past acts, including attorney's fees associated with those acts, it did not give him carte blanche to go out and commence new litigation about the contract without consequences.

*Id.* at 534.

Accordingly, I would affirm the bankruptcy court's decision, relying on *Siegel* and based upon the debtor's decade long and postpetition odyssey of litigation, that she was not discharged from the attorney's fees incurred by Rockwell post bankruptcy. Therefore, I dissent.